**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BETHANEE CALVERT,<br><br>Defendant. | No. 25-CR-3065-LTS-KEM<br><br>**REPORT AND RECOMMENDATION** |

Bethanee Calvert moves to suppress statements she made to law enforcement during a traffic stop and execution of a search warrant, arguing that there is no evidence she was read and waived her *Miranda*[1] rights. Docs. 130, 141. The Government resists. Doc. 152.

I held a hearing on the motion on September 23, 2026. Doc. 158. The Government presented testimony from Lieutenant Frank Hodak of the Cerro Gordo County Sheriff's Office; Iowa State Patrol Trooper Mitchell Williams; and Deputy Adam Nerlien of the Wright County Sheriff's Office.[2] I also admitted the following exhibits into evidence:

- Exhibit B (on Clerk's drive) – Wright County Sheriff's Deputy Ray Zeien's patrol car dash camera video;
- Exhibit B1 (on Clerk's drive) - Deputy Zeien's patrol car backseat video;
- Exhibit B2 (on Clerk's drive) – Deputy Nerlien's body camera video;
- Exhibit C (on Clerk's drive) – Lieutenant Hodak's police report;

[1] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

[2] At the time of the events at issue, Lieutenant Hodak was a deputy, and Trooper Williams was a special agent with the Iowa Division of Narcotics Enforcement.

- Exhibit D (Doc. 142-2) – Emails between defense counsel and the Government; and
- Exhibit 1 (on Clerk's drive) – Lieutenant Hodak's audio recording.

I recommend **granting** the motion to suppress (Doc. 130).

## *I. BACKGROUND*

The procedural background of this case is relevant to both the Government's continued assertion that Calvert lacked good cause to file her suppression motion beyond the pretrial motion deadline and consideration of the evidence. The grand jury indicted Calvert on one count of possession with intent to distribute methamphetamine in December 2025. Doc. 5. Her initial appearance and arraignment were held on January 14, 2026. Doc. 32. The court entered a stipulated discovery order (Doc. 43), and the Government produced an audio recording (Ex. 1) and police report (Ex. C) by case agent Lieutenant Hodak surrounding a traffic stop and execution of a search warrant on August 22, 2024. Shortly after Lieutenant Hodak's audio recording of the August 2024 encounter begins, he tells Calvert that there is a warrant to search her and the car she was a passenger in. He says something along the lines of, "You've heard your *Miranda* warning, right?" Calvert responds, "Mmm."[3] Lieutenant Hodak's report indicated that when he arrived on the scene, he "asked if [Calvert] had been advised of her Miranda warning," and he "was advised by Deputy Nerlien she had been." Ex. C.[4]

On January 20, 2026, defense counsel requested any body camera footage from the Wright County Sheriff's Office of the traffic stop. Counsel for the Government

[3] The Government argued Calvert made a two-syllable noise more akin to "Mmm hmm," but I hear only one syllable.

[4] Lieutenant Hodak's report also states he confirmed that Agent Ochoa gave *Miranda* warnings to the driver and that he Hodak himself provided *Miranda* warnings to the male passenger; the former can be heard on the video evidence.

responded that "[b]ody cam footage from the locals was already requested," he would "have Deputy Hodak double check on that, but we were assuming there wasn't any," and he would "update [defense counsel] once we hear back from the locals on the body cam footage." Doc. 127-1. Defense counsel explained the "reason for the body cam request is the assertion that 'Miranda' was provided by a local officer"; he wanted to "hear" and "see that." *Id.*

Trial was originally scheduled for March 9, 2026; the deadline to file pretrial motions expired in February 2026. Doc. 44. A codefendant moved to continue trial by 90 days; Calvert resisted and asked the court to either continue trial by no more than 30 days or else sever her trial from the codefendants, who were charged with additional charges in the indictment. Docs. 57, 58. The court denied severance and continued trial for all defendants to May 11, 2026. Doc. 60. Calvert initially resisted a codefendant's second motion to continue (Doc. 73) and asked that the court not continue trial beyond May 18, 2026, or alternatively sever her trial (Doc. 77). Calvert ultimately agreed to trial being continued to August 3, 2026. Docs. 82, 83.[5]

The parties prepared for the August 3 trial. On Wednesday, July 22, 2026, a week and a half before the trial date, the Government produced for the first time Deputy Zeien's patrol car video and Deputy Nerlien's body camera video, which captured the forty or so minutes of the August 2024 traffic stop before Lieutenant Hodak's arrival. Ex. B, B1, B2. In conflict with Lieutenant Hodak's police report, Deputy Nerlien's body camera video shows that he never gave Calvert her *Miranda* warning.

On Friday, July 24, defense counsel emailed the Government, having had a chance to review the newly produced discovery. Ex. D. Defense counsel noted he had "watched Deputy Nerlien's body camera 3 times from the stop til Hodak arrival and there is no

[5] The codefendants eventually pleaded guilty. Docs. 94, 118. The Government obtained a superseding indictment on April 16, 2026, which added Calvert to a charge of conspiring to distribute methamphetamine. Doc. 89.

Miranda provided." *Id.* "Based on this newly produced information," defense counsel believed there was good cause to file a suppression motion. *Id.* The Government responded:

> Just to be clear: Deputy Nerlien's body cam and other video footage has not been produced to you. I believe it is no longer in existence because he was not the deputy that initiated the traffic stop, but a secondary assisting officer on scene. It's my understanding that his footage was deleted after a certain period of time because of that categorization. (I am triple checking now to confirm the footage no longer exists.) The footage you do have is from Deputy [Zeien's] cameras, the traffic stopping officer. In any event, Deputy Nerlien is prepared to testify that he does specifically recall Mirandizing Ms. Calvert and that he did so, but he did not interrogate her.

*Id.* Understandably confused, defense counsel asked for clarification on the videos. *Id.* The Government then acknowledged that one of the videos was a portion of Deputy Nerlien's body camera, apologizing as he "was under the impression there was nothing left" and speculating this video was "saved because it captured the recovery of evidence." *Id.*

That same day, Defendant sought leave to file an out-of-time suppression motion based on the late discovery. Doc. 126. The next day, a Saturday, the Government filed a resistance. Doc. 127. Regarding the late disclosure, the Government stated, "[t]he undersigned bears the responsibility of not following up with the agency after requests for production of the video footage." *Id.* But the Government asserted there was not good cause because "[d]efense counsel was aware of the existence of footage" in January and the status quo had not changed: defense counsel did not have "possession of a video wherein the Defendant was *Mirandized* in January and still does not." *Id.* The Government—apparently still unaware that it had produced Deputy Nerlien's entire body camera video of the encounter—stated:

> The undersigned was able to confirm that a Deputy with the Wright County Sherriff's Office is prepared to testify that he did provide the Defendant with her Miranda warnings prior to Lt. Hodak's arrival on scene. It is my understanding that footage of this portion of the encounter with the Defendant does not exist any longer because it was inadvertently destroyed.

*Id.* The district judge found "good cause shown" for Defendant to be granted leave to file a motion to suppress and set a briefing schedule. Doc. 129.

Defendant filed a motion to suppress (Doc. 130) and supporting brief (Doc. 141). Defendant's motion outlined that Deputy Nerlien's body camera footage captured the traffic stop from the time of Deputy Nerlien's arrival through Lieutenant Hodak's interrogation, and Deputy Nerlien never provided *Miranda* warnings. In the Government's resistance, it finally stopped asserting that Deputy Nerlien provided Defendant with *Miranda* warnings and would testify to such. Instead, it changed its story: Lieutenant "Hodak confirmed with Agent Williams that defendant had been advised of her *Miranda* warnings" and cited a portion of Lieutenant Hodak's audio recording. Doc. 152.

After reviewing the video exhibits and hearing the testimony at the suppression hearing, the court's factual findings regarding the traffic stop are as follows. Prior to the traffic stop, Lieutenant Hodak was investigating Tina Smith (one of the Codefendants in this case) for drug trafficking. Smith told a confidential informant that she was going to pick up drugs, and law enforcement conducted surveillance on her vehicle, in which her male roommate and an unknown woman (Calvert) were passengers. Lieutenant Hodak obtained a search warrant for Smith's vehicle and the passengers therein. While Lieutenant Hodak was briefing his team on the execution of the search warrant for Smith's vehicle, Deputy Zeien with the Wright County Sheriff's Office pulled Smith's vehicle over for speeding (unrelated to Lieutenant Hodak's investigation). Shortly thereafter, Deputy Nerlien arrived on the scene. The deputies removed Smith (the driver) from the vehicle and told her she was being arrested for driving with a suspended license. Ex. B, 17:39; Ex. B2, 22:52:00.[6] Deputy Zeien placed Smith in handcuffs and conducted a patdown of her person without providing a *Miranda* warning. The deputies placed Smith

[6] The time stamps for Exhibit B are based on the length of time into the video; the time stamps for Exhibit B2 are based on the ticker at the top of the video showing the clock time.

in the backseat of Deputy Zeien's patrol car. While Deputy Zeien talked to Smith, Deputy Nerlien returned to Smith's vehicle to obtain identification cards from the two passengers. Ex. B, 19:01; Ex. B2, 22:53:00. They told Deputy Nerlien that they were driving to retrieve Calvert's mother's ashes.

Agent Williams arrived at the scene (he had been involved in the surveillance on Smith as part of Hodak's investigation) and told the deputies about the search warrant for the car and passengers. Ex. B, 21:03; Ex. B2, 22:54:45. Deputy Nerlien and Agent Williams asked the two passengers to step out of the vehicle. Ex. B, 21:30; Ex. B2, 22:55:33. Deputy Nerlien placed the male passenger (from the back driver's side door) in handcuffs while Agent Williams handcuffed Calvert, who was smoking a cigarette. Deputy Nerlien told the male passenger that he was being detained but was not under arrest and that he was being placed in handcuffs for officer safety; he did not read him his *Miranda* rights. There is no audio[7] of what Agent Williams told Calvert, but it was likely along the same lines. It is at this point that Defendant argues she was in custody and any subsequent unwarned statements must be suppressed.[8]

Agent Williams patted Calvert down. Ex. B, 23:13. Once both Calvert and the male passenger were handcuffed, Agent Williams left them with Deputy Nerlien for two minutes. Ex. B, 24:28; Ex. B2, 22:58:31. Calvert spat her cigarette out. Ex. B, 25:40. Another vehicle arrived on the scene, parking in front of the target vehicle, and contained plainclothes officer Agent Emory Ochoa (who was also part of the team that conducted surveillance on Smith). Ex. B, 26:45. Smith, still in the backseat of the patrol car with Deputy Zeien, exclaimed in alarm, "what is happening?" when she saw the fourth law

---

[7] Agent Williams testified at the hearing that he turned on his digital audio recorder but later discovered when he went to turn it off that it had accidentally been turned off, likely when he placed it back in his pocket after turning it on.

[8] Defendant does not seek to suppress her initial statements to Deputy Nerlien while she was still in the car.

enforcement officer arrive. At that point, Deputy Zeien informed Smith there was a search warrant for her vehicle.

Agent Williams returned to the passengers and Deputy Nerlien and patted the male passenger down. Ex. B, 27:04. Calvert complained that her handcuffs were too tight, so Deputy Nerlien walked with her to his patrol vehicle to move her handcuffs from the back to the front. Ex. B2, 23:01:05. Deputy Nerlien then questioned Calvert for three minutes. Ex. B2, 23:03:03-23:06:45. Deputy Nerlien asked whether Calvert had been searched yet, and she said another officer checked her pockets. Deputy Nerlien searched inside Calvert's pockets, removing and counting around $600 in cash. Deputy Nerlien asked Calvert about her travel that day (where she had been before getting picked up by Smith, where they were headed, where they had stopped). When Calvert said they were going to Thornton, Deputy Nerlien informed her Thornton was in the opposite direction. Deputy Nerlien asked whether anything in the car belonged to Calvert, and she said just her phone. The Government conceded at the hearing that it cannot meet its burden of proving Calvert received a *Miranda* warning prior to making these statements (it argues Calvert was not in custody).

While Deputy Nerlien talked with Calvert, Agent Ochoa got into Agent Zeien's patrol car with Smith and provided her with a *Miranda* warning. Ex. B, 32:30. Agent Ochoa explained that there was a search warrant for her car and that they were waiting for Lieutenant Hodak to arrive, who was about twenty minutes away.

At this point, there was an officer shuffle. Deputy Zeien, who had been sitting in his patrol car with Smith, left Smith with Agent Ochoa and began standing with the male passenger (behind the target vehicle and in front of Deputy Zeien's patrol car). Ex. B, 32:30. Agent Williams, who had been with the male passenger, talked briefly with Deputy Nerlien about Deputy Nerlien's conversation with Calvert (Deputy Nerlien said Calvert was a terrible liar), and then seemingly went to Calvert (although he did move his vehicle at one point, walking by the deputies and the male passenger). Ex. B2, 23:06:45; *see* Ex. B, 35:37. And Deputy Nerlien joined Deputy Zeien and the male

passenger. Ex. B, 34:55; Ex. B2, 23:08:38. Deputy Nerlien told the male passenger about the warrant and questioned him for about seven minutes about his activities that day without providing a *Miranda* warning.

Deputy Nerlien then walked back to the patrol car where Agent Ochoa stood with Smith. Ex. B, 42:13; Ex. B2, 23:16:04. Agent Ochoa said Lieutenant Hodak would be there in about ten minutes, and then he took a phone call. Ex. B2, 23:17:20. Deputy Nerlien talked with Smith, and soon Agent Ochoa rejoined them. After a while, Agent Williams walked by, asking Deputy Nerlien if he could watch Calvert for a second. Ex. B2, 23:25:39. Deputy Nerlien went over to Calvert, who was sitting on the curb handcuffed outside of a patrol car, while Agent Williams walked to the target vehicle. Ex. B, 51:53-52:27; Ex. B2, 23:26:28. Agent Williams returned to Calvert with her soda (retrieved from the vehicle), but he told her she did not want to drink it because someone put a cigarette out in it. Calvert suggested she was so thirsty she would drink it anyway, but Agent Williams laughed and said they would get her out of there soon.

Shortly thereafter, Lieutenant Hodak arrived with a female officer, Paige Beaulieu. They first went to the area of Calvert, Agent Williams, and Deputy Nerlien. Deputy Nerlien's body camera video largely captures the same moments as Lieutenant Hodak's audio recording. Ex. B2, 23:28:10; Ex. 1, 00:16. As noted above, after introducing himself and telling Calvert there was a warrant to search her, Lieutenant Hodak said something like, "You've heard your *Miranda* warning, right?" And Calvert responded, "Mmm." Lieutenant Hodak additionally testified that Calvert nodded her head up and down, but this is not captured on the body camera footage (the angle Deputy Nerlien is standing does not show Calvert, who was sitting on the ground at that time).[9] The body camera video shows that Calvert said "mm hmm" or nodded her head at various

[9] Lieutenant Hodak testified at the hearing that he also had a video recording but that it was not preserved due to a misunderstanding about how his department's new system categorized and maintained video evidence.

times when talking to Deputy Nerlien in a way that does not necessarily mean "yes" or was not in response to a specific question: she nodded when Deputy Nerlien first introduced himself (Ex. B2, 23:53:03); she responded "mm hmm" when Deputy Nerlien instructed her to turn around (Ex. B2, 23:02:16); and she said "mm hmm" when Deputy Nerlien said, "money's tight for everyone these days" (Ex. B2, 23:03:32).

At the suppression hearing, Lieutenant Hodak testified that Agent Williams told him that Calvert had already been provided with her *Miranda* warnings. At the very beginning of Lieutenant Hodak's audio recording, if you listen closely (the sound quality is not great), you can hear Lieutenant Hodak talking with another officer. The officer said someone ("he"? "she"? a one syllable name like "Ray"?) "said she got Miranda." Ex. 1, 0:00-0:02. The officer also mentioned the vehicle occupants' story of going to get the mother's ashes. Ex. 1, 0:05-0:06. Deputy Nerlien's body camera footage shows (based on the positions of all the officers) that the officer speaking to Lieutenant Hodak was Agent Williams.

At the suppression hearing, Lieutenant Hodak testified that until he watched Deputy Nerlien's full body camera video, he "was operating under the assumption that [Deputy Nerlien] had provided *Miranda* because that's what I believe I was told." He could not recall who told him this or when. He noted that his audio recording shows Williams told him generally that Calvert had received a *Miranda* warning, but he also spoke on the phone with Deputy Nerlien, Agent Ochoa, and Agent Williams multiple times on his drive to the scene. Lieutenant Hodak testified that he would not have "wrote it in [his] report unless I was told that."[10]

Agent Williams testified that he did not remember giving Calvert a *Miranda* warning. He testified that he would not have made the statement about *Miranda* on the

---

[10] Lieutenant Hodak's report also reflects that Agent Ochoa provided a *Miranda* warning to Smith (captured by the patrol car video) and that Lieutenant Hodak read *Miranda* to the male passenger (suggesting the male passenger had not been warned before that point).

audio recording unless a deputy had specifically told him that Calvert had been Mirandized or he had read her the warnings himself. He testified that he did not speak with Lieutenant Hodak on the phone prior to his arrival on scene. There is no record of his time at the traffic stop: as noted above, his audio recorder was accidentally turned off after he tried to start it; and it is his practice to write a report only if he seized evidence or obtained a direct admission from a suspect (not covered by other officers).

Deputy Nerlien testified that Lieutenant Hodak had called him about the stop while it was in progress, and he made his way to the stop. He testified that he did not provide a *Miranda* warning to Calvert. He acknowledged, however, that prior to reviewing his body camera footage, he had believed he had. He explained that although he had not remembered whether he read Calvert her *Miranda* rights, he "knew [he] talked to her in [his] squad car, so if somebody thought that [he] gave her *Miranda*, if that's what they understood at the time, then" he believed it was possible. He confirmed that the Government's statement to the court about a deputy being "prepared to testify that he did provide the Defendant with her *Miranda* warnings" referred to him, although he said he told counsel for the Government it was "possible." He noted he relied on Lieutenant Hodak's report.

It seems to me that all the officers on the scene believed that Deputy Nerlien read Calvert her *Miranda* rights. I do not find that Agent Williams's statement that someone "said she got *Miranda*" is proof of anything—it could just have been a perpetuation of the misunderstanding. Neither do I put much weight in the fact that Calvert responded, "Mmm," when Lieutenant Hodak said she had gotten her *Miranda* warning, "right?" It appeared more of a rhetorical question than an actual inquiry into whether she understood her rights. And Calvert's response—"Mmm"—could just as easily have been an acknowledgement of Lieutenant Hodak's introduction (as opposed to an assent to his question). I do not think any of the officers acted with ill intent, but there appears to have been a misunderstanding regarding Deputy Nerlien providing the *Miranda*

warning.[11] This mistake was discovered only upon defense counsel's review of Deputy Nerlien's body camera footage, which definitively showed Deputy Nerlien did not read Calvert (or anyone at the scene) *Miranda*.

This highlights the importance of this discovery. At the hearing, I asked counsel for the Government if he continued to assert that there was not good cause for the untimely suppression motion—an issue he raised in his resistance, despite the district judge's prior finding of good cause. He refused to concede the point and continued to argue that the late discovery did not disclose anything that Defendant did not already know. This position is astoundingly baffling to the court. Not only does Deputy Nerlien's body camera footage show something Defendant did not know, it shows something that apparently none of the officers knew—that Deputy Nerlien did not Mirandize Calvert. The video could be argued to be *Brady*[12] material, since it undermines the credibility of Lieutenant Hodak's police report, and it certainly contained a recorded statement of Defendant the Government was required to disclose under Rule 16 and the Stipulated Discovery Order.[13] The Government repeatedly suggested that defense counsel

[11] I found each of the witnesses credible in their testimony, but as the Government has noted it is hard to recall events from over two years ago.

[12] ***Brady v. Maryland***, 373 U.S. 83 (1963).

[13] **Fed. R. Crim. P. 16(a)(1)(B)** ("Upon a defendant's request, the government must disclose . . . any relevant written or recorded statement by the defendant if [the] statement is within the government's possession, custody, or control; and the attorney for the government knows—**or through due diligence could know**—that the statement exists." (emphasis added)). Paragraph 1 of the Stipulated Discovery Order provides the Government will disclose "Rule 16, *Brady*, and Jencks Act materials of which the United States Attorney's Office is aware and possesses." Doc. 43. Because the obligation to disclose *Brady* material "encompasses evidence 'known only to police investigators and not to the prosecutor[,]' . . . . 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in th[e] case, including the police.'" ***Strickler v. Greene***, 527 U.S. 263, 280-81 (1999) (quoting ***Kyles v. Whitley***, 514 U.S. 419, 437-38 (1995)).

> [T]he prosecution . . . alone can know what is undisclosed . . . . This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the

was just as much at fault for the late disclosure, since he knew about its existence back in January. Excuse me? Aside from demonstrating a complete lack of understanding of the Government's discovery obligations, this assertion fails to recognize that defense counsel did not know the body camera footage existed in January. Counsel for the Government repeatedly suggested it had been destroyed—*including after it had been produced to Defendant*! Indeed, in resisting Defendant's motion to reset the pretrial-motions deadline for good cause, the Government *represented to the court* that the portion of Deputy Nerlien's body camera footage showing him reading Calvert her Miranda rights "was inadvertently destroyed"—even though the video of the entire encounter *existed and had been produced* (as defense counsel had explained to the Government via email).

At the hearing, I tried to ask the Government how this possibly could have happened—how something this significant could fall through the cracks. Counsel for the Government said he would elicit an explanation through the testimony, but that did not really happen. And during argument, counsel for the Government got extremely defensive about any suggestion of a discovery violation, arguing that the issue was not raised. Fair point, but the issue of good cause was—by the Government. The Government's conduct here is extremely concerning. I do not think there was any malintent. But the Government's conduct goes beyond run-of-the-mill sloppiness and approaches gross incompetence. Despite my questions at the hearing, the Government provided no information on how it believed for so long that the videos were destroyed: Who did the Government ask about this discovery? When? Did anyone tell the

---

> police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith [under *Brady*], the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

***Kyles***, 514 U.S. at 437-38.

Government the videos were destroyed, or did the Government simply assume? How were the videos ultimately discovered? Counsel for the Government appeared to have no idea why this late disclosure was a problem—which is the cause of my concern. Counsel for the Government fails (still) to recognize his obligation to timely produce the videos, and he lacks an understanding of the significance of this evidence.[14]

The background of how this suppression hearing came to be also bears on the ultimate factfinding. It is certainly relevant that as recently as two months ago, all three of the officers who testified at the hearing believed that Deputy Nerlien had provided Calvert with her *Miranda* warning.

Defendant seeks suppression of the statements she made after she was handcuffed based on the lack of *Miranda* waiver. Docs. 130, 141. In its resistance (Doc. 152), the Government first argued the motion was untimely and there was no good cause to extend the pretrial-motions deadline (an argument I find incredulous, as explained above). Second, the Government argued that between Agent Williams's statement that Calvert received *Miranda,* Calvert's "mmm," and Lieutenant Hodak testifying she nodded her head yes, there was proof Calvert waived her *Miranda* rights prior to Lieutenant Hodak's questioning; the Government conceded that it could not prove she was read *Miranda* prior to Deputy Nerlien's earlier questioning. Finally, the Government argued Calvert was not in custody, so *Miranda* warnings were unnecessary.

## *II. DISCUSSION*

Under *Miranda*, a person subject to custodial interrogation must first be advised "that [s]he has the right to remain silent, that anything [s]he says can be used against h[er] in a court of law, that [s]he has the right to the presence of an attorney, and that if

[14] In addition, the Government's late production delayed the case; had the Government obtained and produced the discovery in January or even February, as it said it was going to do, this motion could perhaps have been heard prior to the prior trial dates in March and May 2026.

[s]he cannot afford an attorney one will be appointed for h[er] prior to any questioning if [s]he so desires."[15] The person must waive these rights before the interrogation can proceed.[16] A valid *Miranda* waiver must be knowing, intelligent, and voluntary.[17] For a waiver to be knowing and intelligent, "the suspect must have waived h[er] rights 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"[18] For a *Miranda* waiver to be voluntary, it must be "the product of a free and deliberate choice[,] rather than intimidation, coercion, or deception."[19] The Government bears the burden of proof to show waiver by a preponderance of the evidence.[20]

The Government has not met its burden of proving a valid *Miranda* waiver here. As outlined in the background section, I find that law enforcement did not advise Calvert of her rights under *Miranda* prior to questioning.

*Miranda* warnings are required only if the person is "in custody," that is, "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[21] The Eighth Circuit has identified six factors that bear on this inquiry:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or

---

[15] 384 U.S. at 479.

[16] ***Id.***

[17] ***United States v. Vinton***, 631 F.3d 476, 483 (8th Cir. 2011).

[18] ***Id.*** (quoting ***Moran v. Burbine***, 475 U.S. 412, 421 (1986)).

[19] ***Id.*** (quoting ***Moran***, 475 U.S. at 421).

[20] ***Colorado v. Connelly***, 479 U.S. 157, 167-68 (1986).

[21] ***United States v. Kaeding***, 170 F.4th 1094, 1104 (8th Cir. 2025) (quoting ***United States v. Czichray***, 378 F.3d 822, 826 (8th Cir. 2004)).

> voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.[22]

The court considers "the totality of the circumstances" to determine "whether a reasonable person would have felt that he or she was free to terminate the interview and leave."[23]

Here, law enforcement did not tell Calvert that she could decline to talk to them. She likely heard that she was detained but not under arrest, as Deputy Nerlien told the male passenger of the vehicle. She was placed in handcuffs (first behind her back, then in the front) and taken to a squad car away from her friends. Law enforcement allowed her to continue smoking a cigarette when first handcuffed, but when she wanted her soda, she was not allowed to get it herself (an agent went to retrieve it for her). Law enforcement patted her down and later searched her pockets, removing a large wad of cash. She did not initiate contact, but rather, was stopped as the passenger in a speeding vehicle, then informed she was the subject of a search warrant. Law enforcement did not use strong arm tactics or place her under arrest at the conclusion of the search. She was first questioned by Deputy Nerlien (with three other officers on the scene but not involved in questioning), then later questioned by Lieutenant Hodak in a group of four officers (with two other officers on the scene).

The Government argues Calvert's circumstances here were akin to an ordinary traffic stop, for which *Miranda* warnings are not required. But a person is not normally handcuffed during a traffic stop. Nor is it typical to have four police vehicles and officers on the scene. Significantly, Calvert was detained, at least in part, to be searched pursuant to a search warrant. The Eighth Circuit has held that during a warrant search, when a

---

[22] ***Id.*** at 1104-05 (quoting ***United States v. Griffin***, 922 F.2d 1343, 1349 (8th Cir. 1990)).

[23] ***Id.*** at 1104 (quoting ***United States v. Williams***, 760 F.3d 811, 814 (8th Cir. 2014)).

person is "detained, handcuffed, and patted down" during questioning and not told she can "abstain from answering questions," that person is in custody for purposes of *Miranda*.[24]

I recommend finding that Calvert was in custody and that she was not read and did not waive her *Miranda* rights. Therefore, I recommend suppressing the statements she made to Deputy Nerlien and Lieutenant Hodak while handcuffed in response to their questioning.

## *III. CONCLUSION*

The court recommends **GRANTING** Defendant Calvert's motion to suppress (Doc. 130) and prohibiting the Government from using in its case-in-chief Calvert's unwarned statements on August 22, 2024, after she was handcuffed.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections.[25] Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[26] Failure to object to the Report and Recommendation waives the right to de

---

[24] ***United States v. Cowan***, 674 F.3d 947, 957-58 (8th Cir. 2012).

[25] **LCrR 59**.

[26] *See* **Fed. R. Crim. P. 59**.

novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[27]

**DATED** September 30, 2026.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

[27] ***United States v. Wise***, 588 F.3d 531, 537 n.5 (8th Cir. 2009).